**SECURITY SAVINGS BANK, Plaintiff,**

v.

**GREEN TREE ACCEPTANCE, INC.; Midwest Savings Association, F.A.; Resolution Trust Corporation, as Conservator for Midwest Savings Association, F.A.; and the Federal Deposit Insurance Corporation, as Managing Agent of Midwest Savings Association, F.A., Defendants.**

**No. 3–89 Civ. 28.**

United States District Court, D. Minnesota, Third Division.

June 15, 1990.

Milstead & Ridgway by Steven E. Peckel, Vineland, N.J., and Briol & Wilmes by Gregory L. Wilmes, Minneapolis, Minn., for plaintiff.

Briggs & Morgan by Richard G. Mark, Minneapolis, Minn., for defendant Green Tree Acceptance, Inc.

Hessian, McKasy & Soderberg by William Borchers, and Lee A. Henderson, Minneapolis, Minn., for defendant Midwest Sav. Assn.

## ORDER

ALSOP, Chief Judge.

The above entitled matter came on for hearing on May 25, 1990 on defendants Green Tree and RTC/Midwest's[1] motions

1. Plaintiff's complaint was brought against de-    fendant Midwest Federal Savings and Loan As-

for summary judgment against Security Savings and on defendant RTC/Midwest's motion for summary judgment on Green Tree's cross claim. In addition, plaintiff appeals Magistrate Bernard P. Becker's March 22, 1990 order denying its motion for leave to assert a punitive damages claim.

## I. FACTUAL BACKGROUND

This action involves a dispute relating to the sale and servicing of two loan pools Green Tree sold to Security Savings in 1984 and 1985. In January of 1984 Ron Seagraves, President of Security Savings, received a letter with enclosures from Alan Roers, Vice President of Green Tree, offering to sell a pool of mobile home conditional sales contracts. The literature said, *inter alia*, that no investor had missed a payment or loss on the contracts, and that to secure the investor's purchase, Green Tree had established protection for losses. Seagraves forwarded this material to Stephen Daniels, Vice President of Operations at Security Savings, who then negotiated a contract and servicing agreement with Roers for the first pool of loans Security purchased.

Plaintiff claims that during these negotiations, Roers represented that the loans were sold on a full recourse basis, that Green Tree would repurchase any delinquent loans, and that the underlying contracts were backed by the financial stability of Green Tree. Security Savings also avers that Roers described the loan pools as "risk-free" and "guaranteed" and that the plaintiff need not worry about any losses.

The Sale and Servicing Agreement, dated February 9, 1984, sets out the terms of the transaction. The Purchase Contract, dated February 15, 1984, and subject to the terms of the servicing agreement, describes Security Savings's loan holdings. Under the service agreement Green Tree agreed to service the 5 million dollars worth of contracts purchased, collect proceeds from the retail borrowers and pass these proceeds on to Security. The Purchase Contract provided that Green Tree would remit to Security Savings a finance charge on the pool of contracts not to exceed 12.5 percent. In turn, Green Tree received the difference between the amounts on each loan contract it received from the retail debtor and the amount it paid out to Security Savings as compensation for servicing the loan pool.

In addition, the contract required Green Tree to establish and maintain a reserve fund for losses due to contract defaults. The purchase contract for pool 1 provided that Green Tree was to "establish a reserve fund equal to .75 percent per year add-on, on the principal loan balances...."

Security Savings purchased a second pool of loan contracts from Green Tree on February 6, 1985. Jay Ford, Senior Vice President of Finance at Security Savings, negotiated this purchase with Paul Boyum of Green Tree. The parties again entered into a Sale and Servicing Agreement and Purchase Contract on similar terms as the first pool.[2] Security claims that during the negotiations Boyum told Ford Green Tree would sell pool 2 under the same conditions as pool 1; the loans would be full-recourse.

In May of 1985, Midwest Federal purchased Green Tree's rights under the Sale and Servicing Agreement with Security. However, Green Tree remained the servicer of the loans on a fee-for-service basis.

sociation of Minneapolis ("Midwest Federal"). Midwest Savings Association, F.A. ("Midwest"), which is under the conservatorship of the Resolution Trust Corporation ("RTC"), now controls the assets and liabilities of Midwest Federal, including this lawsuit. The Federal Deposit Insurance Corporation is the managing agent of Midwest. The FDIC, RTC and Midwest have been substituted for Midwest Federal as party defendants in this suit. Hereinafter in this order, the current entity is referred to as "RTC/Midwest."

2. The purchase contract and servicing agreements for pools 1 and 2 were form contracts with spaces for information such as the date, the parties, the number of loans, the interest rate due the buyer, and the multiplier for the reserve fund added in for each pool. Thus, in the case at hand, the terms of the contract were the same with the exception of these penciled in terms.

In May of 1988, Midwest Federal instructed Green Tree to withhold further payments to Security Savings on its pools. Shortly thereafter, in August of 1988, Security Savings instituted the present action.

Plaintiff's Second Amended Complaint alleges defendant Green Tree is liable for breach of contract, breach of fiduciary duty, conversion, theft, negligence, common law fraud, an accounting, and fraud in the sale of the pools. It further alleges that RTC/Midwest is liable for tortious interference with contract, as assignee of the contract and because Security Savings was a third-party beneficiary to the agreement between Midwest Federal and Green Tree, breach of fiduciary duty, conversion, theft, negligence, common law fraud, and an accounting.

## II. SUMMARY JUDGMENT MOTIONS

### A. *Standard of Review*

The Supreme Court held that summary judgment is to be used as a tool to isolate and dispose of claims or defenses which are either factually unsupported or which are based on undisputed facts. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Hegg v. United States,* 817 F.2d 1328, 1331 (8th Cir.1987). Summary judgment is proper, however, only if examination of the evidence in a light most favorable to the nonmoving party reveals no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The test for whether there is a genuine issue of material fact is two-fold. First, the materiality of a fact is determined from the substantive law governing the claim. Only disputes over facts that might affect the outcome of the suit are relevant on summary judgment. *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512; *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.,* 824 F.2d 582, 585 (8th Cir.1987). Second, any dispute over material fact must be "genuine." A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512. It is the nonmoving party's burden to demonstrate that there is evidence to support each essential element of his claim. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

### B. *RTC/Midwest and Green Tree's Motions on Security's Claims*

#### 1. *Breach of Contract*

Plaintiff in Count I alleges Green Tree breached its contract with Security Savings when it began withholding payments received on the loan pool in 1988.

Plaintiff argues that under the contract the loans it purchased are full-recourse, i.e., that Green Tree was obligated to repurchase all defaulted loans. Green Tree and RTC/Midwest, on the other hand, contend that Green Tree was obligated to repurchase defaulted loans only so long as the balance in the reserve fund was positive. Hence, defendants argue Green Tree had the right under the contract to withhold further payments in 1988 because they claim the reserve fund was negative. Plaintiff counters that the positive or negative status of the reserve did not control Green Tree's repurchase obligation. Rather, Security maintains the reserve fund was merely a credit enhancement—that it was established to provide comfort as to Green Tree's overall financial ability to meet the repurchase obligation.

Under Minnesota law, the construction and effect of a contract are questions of law for the court unless there is an ambiguity which requires resort to extrinsic evidence. *Turner v. Alpha Phi Sorority House,* 276 N.W.2d 63, 66 (Minn.1979); *Davis by Davis v. Outboard Marine Corp.,* 415 N.W.2d 719, 723 (Minn.Ct.App.1987). A contract is ambiguous if it is reasonably susceptible of more than one construction. *Republic Nat'l Life Ins. Co. v. Lorraine Realty Corp.,* 279 N.W.2d 349, 354 (Minn. 1979); *Davis,* 415 N.W.2d at 723.

Whether or not a contract is ambiguous is a question of law. *Davis,* 415 N.W.2d at 723. In making this determination, the court construes the parties' con-

tract as a whole, giving words their plain, ordinary meaning, mindful that the "meaning of the contract is to be ascertained from the writing alone, if possible, the duty of the court being to declare the meaning of what is written in the instrument, not what was intended to be written." *Carl Bolander & Sons, Inc. v. United Stockyards Corp.*, 298 Minn. 428, 433, 215 N.W.2d 473, 476 (1974).

Plaintiff argues that at a minimum the contract is ambiguous as to whether Green Tree was obligated to repurchase defaulted loans when the reserve was negative. Thus, interpretation of the contract is a question of fact for the jury and the court should deny Green Tree's motion.

■ Paragraphs 4(e) and 8 of the Sale and Servicing Agreement contain contract provisions relating to the reserve fund and Green Tree's repurchase obligation.

Paragraph 4(e) states that:

Seller–Servicer agrees to establish a reserve fund for losses due to contract defaults equal to the amount set forth in the Purchase Contract less any losses charged against the reserve fund as a result of contract defaults and less any charges due for prepayment of contracts.

Paragraph 8 reads as follows:

*RESERVE REPURCHASE.* In the event a default occurs under the terms of any Contract held by Buyer, which default necessitates that the secured property be repossessed, Buyer shall either (1) forward to Seller–Servicer upon request all original documents necessary for the commencement of a repossession proceeding in the name of Buyer or, (2) reassign all original documents to Seller–Servicer who, in turn, will commence repossession proceedings in its own name. *In either instance, Seller–Servicer shall pay Buyer 90 days after the repossession of the secured property has been completed. The repurchase shall be from reserve funds established from each individual customer obligation purchased by Seller–Servicer as set forth in Paragraph 4(e) herein.* Upon the repurchase from the reserve fund of any particular customer obligation, the reserve fund shall be charged for the then remaining purchase price advanced by Buyer plus Buyer's portion of the finance charge calculated to date of repurchase, pursuant to the terms of the original Contract, and all documents, including Title, shall be assigned to Seller–Servicer. Seller–Servicer agrees upon subsequent sale of the repossessed collateral, to deposit the net proceeds of the sale, after deducting all costs, in the reserve fund or if the sale occurs during the 90-day period, the net loss, if any, on the transaction will be charged to the reserve fund. (Emphasis added)

Plaintiff urges that the service agreement does not explicitly state what happens if the reserve goes negative, and therefore an ambiguity exists. It then offers extrinsic evidence to support its interpretation of the contract. The court agrees with Green Tree, however, that the service agreement clearly provides that the repurchase of defaulted loans is to come out of the reserve. The contract provides first that Green Tree is to repurchase defaulted loans and then that the repurchase shall be from reserve funds. It is tautological that if there are no funds in the reserve, a repurchase of defaulted loans cannot occur. Hence, when the reserve fund is negative, Green Tree has no obligation to repurchase. As the court finds the contract clear on its face, it will grant Green Tree's summary judgment motion on this breach claim.

2. *Alternative Theories of Breach*

a. Prepayments

■ In the alternative, Security contends that Green Tree breached the contract by miscalculating and misapplying the reserve fund. Plaintiff first maintains Green Tree improperly charged the reserves for contract prepayments and limited available reserves to earned reserves. Defendant points to paragraph 4(e), which provides the reserve can be charged for "any charges due to prepayment of contracts," as support for charging the reserve for losses due to loan prepayment by retail borrowers. Plaintiff, on the other hand,

argues this language refers to charges referred to in the individual loan contracts that must be remitted to the borrower if the borrower prepays the debt. The court concurs with the plaintiff that the contract is ambiguous on this point. Paragraph 4(e) provides the reserve is "equal to the amount set forth in the Purchase Contract less any *losses* charged against the reserve fund as a result of contract defaults and less any *charges* due to prepayment of contracts." There are indeed two possible interpretations of this language since there are two situations where prepayment leads to a cost to the lender. Additionally, the contract language refers to default costs as "losses" and prepayment as "charge." This lends credence to plaintiff's interpretation of the language as a reference to the amount owed the borrower on prepayment rather than the loss incurred when the contract is prepaid.

### b. Losses from Default

Security next claims Green Tree improperly charged the reserves for losses occurring where Green Tree's resale of the collateral occurred after 90 days from repossession. Although plaintiff's position in this regard is somewhat unclear, the court gathers that Security interprets the contract to allow Green Tree to charge the reserve for losses due to default only where it sells the collateral within 90 days of repossession. Under the contract, the mechanics of the process for repurchase of the loan, repossession and sale of the collateral appear to be as follows: Security forwards the papers necessary to repossess to Green Tree. Green Tree then repurchases the loan from Security 90 days after it repossesses the collateral. At some point, either before or after the repurchase, Green Tree sells the collateral. The issue before the court arises where there is a loss because the collateral is sold for less than the balance of the loan. This loss can occur in one of two ways. First, if Green Tree sells the collateral before it is obligated to repurchase, it suffers a loss because it pays out more to Security than it received from the sale of the collateral. Second, if the sale is after the 90-day period,

the reserve has paid the full amount of the loan to Security and upon the sale receives the sale price of the collateral. If the sale price is less than the amount due on the loan, a loss results.

Plaintiff argues Green Tree can only charge the reserve for the former type of loss. Thus, plaintiff interprets the contract to require Green Tree to not only remit to the reserve the amount received upon the sale of the collateral if the sale is after 90 days, but also to put money in the reserve to make up for the loss on the sale. Apparently plaintiff would ask that Green Tree also deposit the difference between the sale price and the amount the reserve paid out to Security when it repurchased the defaulted loan. To support this theory, plaintiff cites the last sentence in paragraph 8 which states that: "if the sale occurs during the 90-day period, the net loss, if any, on the transaction will be charged to the reserve fund." Plaintiff argues that because the contract specifically allows the reserve to be charged for a loss during the 90-day period, such a "charge," in the form of failing to replenish the fund for a loss after the 90-day period, is not allowed.

▮ The court cannot agree with plaintiff's strained interpretation of the contract. Paragraph 8 sets forth the repurchase procedure to be followed quite clearly. It specifically states that the repurchase is to come from the reserve fund and that upon subsequent sale (after the repurchase) Green Tree is to deposit the proceeds of the sale into the reserve. Nowhere does it also mandate that Green Tree, from its own funds, replenish the reserve for a loss due to sale of the collateral. Moreover, there was no reason for the contract to allow Green Tree to charge the reserve for the latter loss since this charge was implicit in the procedure set forth in paragraph 8. Thus, as the court finds no ambiguity present, it will grant defendant's motion for summary judgment on this portion of the breach of contract claim.

### c. Deficiency Judgments

Security also alleges Green Tree breached the contract by misappropriating defi-

ciency judgments collected from retail borrowers, rather than using them to replenish reserves. Plaintiff contends that Green Tree has collected at least $53,582.50 in deficiency judgments on loans in Security's pools and failed to either remit it to Security or use it to replenish the reserve fund. The contract does not address the issue of Green Tree's obligation as to deficiency judgments. Defendant has not responded to this breach of contract claim in its reply memorandum. In addition, it is conceivable that under the contract such judgments are to be used to replenish the fund. Consequently, the court will deny defendant's summary judgment motion on this portion of the breach of contract claim.

### d. Reserve Calculations

Finally, Security avers that Green Tree incorrectly calculated aggregate reserves because it failed to use the proper contract definitions of "principal" and "unpaid balance" in determining the balance in the reserve fund. Green Tree responds to plaintiff's interpretation of the proper method of reserve calculation with the conclusory statement that plaintiff's argument is "absurd on its face" and quotes evidence extrinsic to the contract to support Green Tree's method of reserve calculation. Defendant has failed to make any coherent argument as to why the contract on its face unambiguously supports its method of reserve calculation. Therefore, the court must deny Green Tree's summary judgment motion on this point.

### 3. *Tortious Interference with Contract*

Count II of the Second Amended Complaint alleges RTC/Midwest is liable for tortiously interfering with Security's contract with Green Tree. The Supreme Court of Minnesota set forth the elements of this tort in *Royal Realty Co. v. Levin,* 244 Minn. 288, 292, 69 N.W.2d 667, 671 (Minn. 1955):

> Recovery may be had for inducing breach of contract by establishing (1) the existence of a contract; (2) the alleged

wrongdoer's knowledge of the contract; (3) his intentional procurement of its breach; (4) without justification; and (5) damages resulting therefrom.

■ In addition, this tort implicitly requires the plaintiff to prove that Green Tree breached its contract with Security. However, the court has already ruled it will grant Green Tree's summary judgment motion on certain breach claims. Therefore, it will also grant RTC/Midwest's summary judgment motion on Count II as it relates to these claims.

■ The issue remains, however, whether certain calculations of the reserve breached the contract. Nonetheless, the court must also grant summary judgment on the tort claim as to these contract provisions. While the plaintiff has arguably proffered sufficient evidence to survive summary judgment as to elements one, two, four, and five, the same cannot be said of element three. The contract may well be ambiguous on the remaining breach claims, and the plaintiff has not offered any evidence to show that RTC/Midwest knew that the calculation of the reserve breached the contract.[3] Hence, the court cannot conclude RTC/Midwest intentionally procured a breach of the contract and will grant defendant's motion on this count.

### 4. *Third–Party Beneficiary and Assignee Liability*

Security next alleges that, under the agreement between Midwest Federal and Green Tree, Midwest Federal assumed Green Tree's obligations to Security Savings under the Sales and Servicing Agreement and as assignee, RTC/Midwest is liable to Security for breach of contract. Additionally, Security claims it was a third-party beneficiary to the contract between Midwest Federal and Green Tree and that, as such, RTC/Midwest is liable for breach of contract and Security is entitled to full performance.

---

**3.** Plaintiff does offer extrinsic evidence to show RTC/Midwest had reason to suspect that withholding funds where the reserve was negative breached the contract. This evidence, however, is not relevant to a claim of tortious interference with contract based on the alleged miscalculation of the reserve fund.

As with the tortious interference claims, the court will grant summary judgment on this count as it relates to contract provisions where no breach was found, i.e., the obligation to repurchase where the fund is negative and the obligation to replenish the fund for sales taking place more than 90 days after repossession. The court must, however, further analyze this cause of action as it relates to the remaining breach theories.

RTC/Midwest argues that the *D'Oench* doctrine and 12 U.S.C. § 1823(e) defeat all of plaintiff's claims, with the exception of negligence and fraud in servicing. The petitioner in *D'Oench, Duhme and Company v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), was the obligor on a note given to a bank so the bank could retain defaulted bonds on its books. When the bank later became insolvent and the FDIC sought to enforce the note, the obligor asserted as a defense a written side agreement between the obligor and the bank to the effect that the note was not to be enforced. The Supreme Court held that even though the obligor had a writing to evidence his agreement with the bank, the note would be enforced as it appeared in the bank's records, free of the side agreement.

Defendant sees Security's claim as an attempt to enforce a side agreement like the one in *D'Oench*. Arguing that the contract is clear on its face as to Green Tree's obligations, it concludes that under *D'Oench* the court should enforce the agreement as written. RTC/Midwest also cites 12 U.S.C. § 1823(e), claiming it precludes the court from admitting evidence of any side agreement in addition to the contract. The statute reads, in pertinent part, as follows:

> No agreement which tends to diminish or defeat the interests of the Corporation in any asset acquired by it under this section ... shall be valid against the Corporation unless such agreement (1) is in writing....

RTC/Midwest's arguments may well have had merit as to the general breach of contract claim relating to Green Tree's obligations where the fund is negative.[4] This is true because the court found the contract unambiguous on this point. Thus, any attempt by plaintiff to prove its interpretation of the contract could be construed as an attempt to show an oral side agreement. The court cannot, however, conclude that *D'Oench* and section 1823(e) apply to the remaining breach claims. There has been no finding that these contract provisions are unambiguous. The plaintiff contends they are ambiguous and that extrinsic evidence should be admitted to interpret these terms. The court has determined that the prepayment term is ambiguous and denied Green Tree's motion on the other terms for lack of sufficient argument to the contrary. Defendant RTC/Midwest makes no specific arguments as to whether these terms are ambiguous; its brief is devoted to a discussion of its liability on the general breach claim. Assuming the terms are ambiguous, the plaintiff is not attempting to prove a side contract on the method of computing reserves, but rather is seeking to place its interpretation on the contract terms.

As such, *D'Oench* is inapplicable because if plaintiff prevails on its breach claim, the jury will have found not that there was a side agreement as to how the reserve was to be calculated, but that under the contract, as purchased by the defendant, plaintiff's reserve calculation is proper. *See FDIC v. O'Neill*, 809 F.2d 350, 354 (7th Cir.1987); *Howell v. Continental Credit Corp.*, 655 F.2d 743, 747–48 (7th Cir.1981). Similarly, RTC/Midwest cannot rely on section 1823(e) because plaintiff does not seek to enforce an agreement that is "not in writing," but instead contends the written agreement between Green Tree and Security prescribes a certain method for calculating reserves.

Defendant RTC/Midwest does not discuss the merits of Security's assignee and

---

**4.** Since the court has already decided it will grant summary judgment in RTC/Midwest's favor on contract claims related to this breach, there is no need to decide if *D'Oench* and section 1823 also defeat Security's claims.

third-party beneficiary claim. Therefore, as the court cannot grant summary judgment on the remaining breach claims based upon *D'Oench* or section 1823(e), it will deny RTC/Midwest's motion on this count.

### 5. *Breach of Fiduciary Duty*

Count IV of the Second Amended Complaint alleges that defendants Green Tree and RTC/Midwest breached their fiduciary duties to Security. Plaintiff proffers no evidence that a fiduciary relationship existed between RTC/Midwest and itself. Therefore the court will grant RTC/Midwest's motion on this count.

The thrust of Security's claim against Green Tree is that as Security's agent, Green Tree owed a fiduciary duty which it breached by, *inter alia,* assigning the servicing rights to Midwest Federal without Security's consent and by withholding Security's funds.

To establish a fiduciary duty based on its theory, plaintiff must allege sufficient facts to support its claim that Green Tree was Security's agent. The Minnesota Supreme Court, quoting the Restatement of Agency 2d, has noted that:

> Agency is a legal concept which depends upon the existence of required factual elements: the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking.

*PMH Properties v. Nichols,* 263 N.W.2d 799, 803 (Minn.1978).

As a matter of law, this court finds plaintiff has failed to set forth sufficient evidence that Green Tree acted as its agent. Under the contract, Security did not have the authority to control Green Tree in its servicing of the loans. The plaintiff cites the following provisions in the contract as evidence of Security's control over Green Tree: "Seller–Servicer shall take all steps as authorized and directed by Buyer to enforce the rights of Buyer under any contract...." [para-

graph 5(b)(ix)] and "Seller–Servicer shall perform such other duties as may be reasonably requested by Buyer" [paragraph 5(b)(x)]. These provisions alone do not support the allegation that Security controlled Green Tree. There is no evidence that Security controlled any of the methods by which Green Tree serviced the loans. Rather, Security was akin to an investor; it bought the contracts from Green Tree who serviced the loans and provided Security with a return on that investment. Consequently, the court finds no agency relationship existed between Green Tree and Security and will grant defendant's summary judgment motion on Count IV.

### 6. *Conversion and Theft*

Count V alleges Green Tree and RTC/Midwest converted Security's money when Green Tree took the loan proceeds owned by Security and delivered them to Midwest. Count VI also avers defendants' actions constituted theft and thus violated *Minn.Stat.* § 609.53 subd. 4. Conversion is defined as an act of willful interference with the personal property of another that is without justification or that is inconsistent with the rights of the person entitled to the use, possession or ownership of the property. *Hildegarde, Inc. v. Wright,* 244 Minn. 410, 70 N.W.2d 257 (1955).

The court finds no evidence that Green Tree or RTC/Midwest willfully interfered with Security's property, thus this cause of action fails as well. The contract in this case clearly did not require Green Tree to repurchase defaulted loans. Thus, Green Tree's withholding of payments when the reserve fund was negative was reasonable and the conversion count cannot survive summary judgment. Similarly, the court will grant defendants' motion as to the theft claim as, *inter alia,* there is no evidence of intent as required by the statute.[5]

### 7. *Negligence*

This claim centers around the allegation that Green Tree negligently managed the

---

5. In addition, it is questionable whether *Minn. Stat.* § 609.53 applies where there has been no criminal prosecution for theft.

loan pools, miscalculated the reserves and failed to keep Security informed. The court will grant defendants' summary judgment motion on the negligence cause of action for two reasons.

■ First, plaintiff's brief merely sets out this allegation and provides no facts to support it. Second, any duty defendants may owe plaintiff in administering the fund arises out of contract obligations. Under Minnesota law, plaintiff may not receive extra-contractual damages for a tort action based upon a breach of contract; to recover for a willful breach of contract, plaintiff must prove it constituted an independent tort. *Wild v. Rarig*, 302 Minn. 419, 234 N.W.2d 775, 789–90, (Minn.1975). Therefore, as no independent tort exists, the court will grant summary judgment on the negligence count.

### 8. *Common Law Fraud and Fraud in the Sale*

Counts VIII and X's fraud claims are pled in the alternative; given that the court has decided the contract is not full-recourse, Security would argue that it was defrauded into entering into these transactions and that Green Tree is liable for post-sale omissions as well. In addition, although plaintiff's memorandum does not address this claim, the Second Amended Complaint alleges common law fraud against RTC/Midwest, apparently on the ground that it also owed a duty to disclose post-sale facts to Security.

Security's fraud in the sale claim stems from the following alleged misrepresentations by Green Tree:

(1) The investments in the pool were guaranteed by Green Tree;

(2) The pools were risk-free investments;

(3) The pools were similar to GNMA certificates; and

(4) The pools were protected against loss by Green Tree reserves.

The Minnesota Supreme Court, in *Davis v. Re–Trac Mfg. Corp.*, 276 Minn. 116, 149 N.W.2d 37, 38 (1967), reviewed the elements of the fraud tort. For plaintiff to prove fraud it must show, *inter alia*, that

Green Tree made a false misrepresentation of a material fact and that Security justifiably relied on the misrepresentation. *Id.* Since it is clear that Security's reliance upon the alleged misrepresentations was not justified, the court need not analyze whether plaintiff has satisfied each element of this tort.

■ Whether reliance is justified is determined "with reference to the specific intelligence and experience of the aggrieved party rather than a reasonable-person standard." *Midland Nat'l Bank v. Perranoski*, 299 N.W.2d 404, 412 (1980). Green Tree's alleged misrepresentations all relate to the same question—did Green Tree mislead Security into believing it would repurchase all defaulted loans, regardless of the balance in the reserve fund? The contract clearly stated that Green Tree would repurchase defaulted loans and that this repurchase would come from the reserve fund. As noted earlier, the contract is unambiguous; Green Tree is not obligated to repurchase loans where the reserve is negative. Therefore Security, as a sophisticated investor, could not have justifiably believed the pools were full-recourse where the contract itself placed limitations on Green Tree's obligation to repurchase. Consequently, the court will grant Green Tree's summary judgment motion on Count X.

Plaintiff's common law fraud claim rests on the assumption that Green Tree and RTC/Midwest owe a fiduciary duty to Security. It contends that defendants, in breach of their fiduciary duties, failed to timely disclose material facts to Security. The court has already found, however, that no evidence of a fiduciary relationship between Green Tree or RTC/Midwest and Security existed. Moreover, it is questionable whether the omitted facts were material; whether plaintiff would have acted differently had it known the status of the loans and reserves, and had it been informed that Green Tree had sold its servicing rights to Midwest. The court will therefore grant defendants' summary judgment motion on this claim.

### 9. *An Accounting*

Finally, in Count IX, plaintiff asks for an accounting of all sums received by the defendants from and after the sale of the pools to Security to the date of the accounting. In order to obtain the equitable relief of an accounting, plaintiff must first establish a fiduciary relationship existed between itself and Green Tree or RTC/Midwest. *Johnson v. Johnson*, 272 Minn. 284, 137 N.W.2d 840 (Minn.1965). Since plaintiff has not established such a relationship, the court will grant defendants' motion on this count as well.

### C. *RTC/Midwest's Motion on Green Tree's Indemnity Claim*

Defendant RTC/Midwest has also moved for summary judgment on Green Tree's claim for indemnification under the 1985 Servicing Sale Agreement, by which Midwest Federal purchased Green Tree's interest in the servicing income stream. RTC/Midwest asserts that the federal common law of *D'Oench* and 12 U.S.C. § 1823(e) preclude this cross claim. It argues, as with plaintiff's contract claims against it, that any liability on the cross claim would arise as a result of oral side agreements. However, the only remaining claim against Green Tree will be plaintiff's breach of contract claim based on Security's interpretation of the servicing agreement between itself and Green Tree. As noted earlier, plaintiff's remaining claim is based not upon an alleged side agreement, but rather upon its interpretation of the written service agreement it had with Green Tree. Therefore the court will not grant summary judgment on this ground.

RTC/Midwest further argues that provisions in the 1985 servicing agreement between itself and Green Tree defeat the indemnity claim. To begin with, defendant cites a provision that states Midwest would not be responsible for acts or omissions committed or omitted prior to Green Tree's assignment to Midwest. In addition, it quotes contract language that provides that the servicing agreements constitute the entire agreement between Green Tree and investors (such as Security).

RTC/Midwest thus contends these provisions preclude an indemnity claim based on an alleged side agreement that arose before its contract with Green Tree. Again, the court has concluded that the only remaining claim against Green Tree arises not out of a side agreement, but out of the interpretation of the contract between plaintiff and Green Tree. Thus, RTC/Midwest's motion will be denied on this ground as well.

### III. APPEAL FROM THE MAGISTRATE'S ORDER

The final matter before the court involves Security's appeal from Magistrate Bernard P. Becker's March 22, 1990 order denying its motion to assert a punitive damages claim. Plaintiff bases its punitive damages claim on the tort causes of actions alleged in its Second Amended Complaint. The court, however, has granted summary judgment on all plaintiff's tort claims, thus rendering plaintiff's appeal moot. The court therefore will affirm the magistrate's order denying plaintiff leave to amend.

Nonetheless, as there is a split in the district on the issue of the applicability of *Minn.Stat.* § 549.191 in federal diversity cases, the court discusses this matter further. The undersigned has previously concluded that section 549.191, which prohibits pleading punitive damages without leave of the court, is procedural in nature and does not affect the ultimate outcome of plaintiffs' claims for punitive damages. *Jacobs v. Pickands Mather & Co.*, Civ. 5–87–49, 1987 WL 47387 (D.Minn. Aug. 24, 1987). Thus, in *Jacobs*, under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 74–75, 58 S.Ct. 817, 820–21, 82 L.Ed. 1188 (1938), federal procedural law was applied and defendant's motion to dismiss the punitive damages claim was denied. *Id.*

Subsequently, this issue has come before other judges of the district who have concluded that, under *Erie* analysis, federal courts must apply section 549.191 in diversity cases to avoid forum shopping. *Kuehn v. Shelcore, Inc.*, 686 F.Supp. 233 (D.Minn.1988); *see also Zeelan Indus., Inc. v. De Zeeuw*, 706 F.Supp. 702 (D.Minn.

1989); *Webster Truck & Caster Co. v. The Nutting Co.,* Civ. 3–88–662 1989 WL 222673 (D.Minn. Feb. 6, 1989). In the interest of consistency within the district and because the undersigned is persuaded by the reasoning of these opinions, I will henceforth apply *Minn.Stat.* § 549.191 in federal diversity cases.

Accordingly,

IT IS HEREBY ORDERED That:

1. Defendant Green Tree's summary judgment motion on Count I, breach of contract, and defendant RTC/Midwest's motion on Count III, assignee and third party beneficiary liability, are granted in part and denied in part as follows. Summary judgment is granted on these counts as they relate to Green Tree's repurchase obligation. Summary judgment on these counts is also granted as they relate to calculation of the reserve where sales took place more than 90 days after repossession. Summary judgment is denied, however, as to the remaining claims as they relate to calculation of the reserve fund.

2. Defendant RTC/Midwest's motion for summary judgment on Count II, tortious interference with contract, is granted.

3. Defendants RTC/Midwest and Green Tree's motions for summary judgment on Count IV, breach of fiduciary duty, are granted.

4. Defendants RTC/Midwest and Green Tree's motions for summary judgment on Count V, conversion, are granted.

5. Defendants RTC/Midwest and Green Tree's motions for summary judgment on Count VI, theft, are granted.

6. Defendants RTC/Midwest and Green Tree's motions for summary judgment on Count VII, negligence, are granted.

7. Defendants RTC/Midwest and Green Tree's motions for summary judgment on Count VIII, common law fraud, are granted.

8. Defendants RTC/Midwest and Green Tree's motions for summary judgment on Count IX, an accounting, are granted.

9. Defendant Green Tree's motion for summary judgment on Count X, fraud in the sale, is granted.

10. The magistrate's order dated March 22, 1990, denying plaintiff's leave to amend, is affirmed.