Pamela L. **ULRICH**, Plaintiff,

v.

**CITY OF CROSBY, its Chief of Police, Albert C. Fort, Individually, Ralph LaPlant, Individually, and Raymond Ferrari, Individually, Defendants.**

Civ. No. 5–92–208.

United States District Court,
D. Minnesota,
Fifth Division.

Feb. 18, 1994.

---

864

Daniel E. Warner, Warner Law Office, Eagan, MN, for plaintiff.

John M. Baker, Greene & Espel, Minneapolis, MN, for defendants.

ORDER

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(A), upon the Plaintiff's Motion for leave to amend her Complaint, pursuant to Minnesota Statutes Sections 549.191 and 549.20, so as to allege a claim for punitive damages against each of the Defendants,[1]

---

1. Under the provisions of Minnesota Statutes Sections 549.191 and 549.20, the Plaintiff need

and upon the Plaintiff's Motion for an Order compelling discovery against the Defendant Ralph LaPlant ("LaPlant").

At a Hearing on the Motions, the Plaintiff appeared by Daniel E. Warner, Esq., and the Defendants appeared by John M. Baker, Esq.

For reasons which follow, each of the Plaintiff's Motions will be denied.

## II. *Factual and Procedural Background*

The Plaintiff began her employment as a Police Officer for the Defendant City of Crosby ("City") on May 1, 1991. In that capacity, she holds the distinction of being the first full-time female Police Officer in the City's history. During her term of employment, the Chief of Police was the Defendant Albert C. Fort ("Fort"). The remainder of the Crosby Police Force consisted of a small number of full and part-time Officers, including the Defendant Raymond Ferrari ("Ferrari") and the Defendant LaPlant. With some frequency, Ferrari or LaPlant would accompany the Plaintiff in her squad car, while they were serving their duty watch.

Prior to the Plaintiff's employment with the City, she had some limited experience in law enforcement. From February 7, 1991 to April 16, 1991, she worked for the Minnesota River Valley Drug Task Force as an undercover agent. Before that, the Plaintiff worked from November of 1989 to August of 1990, at the Northwest Juvenile Training Center in Bemidji, Minnesota. She also held a position with the Security Patrol at Bemidji State University for a period of several years, during which time she was earning her undergraduate degree in criminal justice. She received that degree in May of 1990.

When the Plaintiff was hired by the City, she began as a probationary employee. Under the collective bargaining agreement between the Police Officers' union and the City, newly hired Police Officers were to complete a probationary period of one year, during which time the employee could be discharged at the sole discretion of the City, and without any obligation to submit the propriety of that discharge to arbitration.[2] At the outset of her employment, the expectations for success were high.

As of her first performance evaluation on August 1, 1991, Fort rated the Plaintiff as average to above-average in every category, and he concluded that she had "no major week [sic] points." In comparison to other employees who had the same length of service, Fort rated the Plaintiff as "definitely above average." Nevertheless, by the time of the Plaintiff's next evaluation on November 1, 1991, Fort's appraisal of her work had plummeted, causing him to observe that she was "[u]n able to get along with most people she works with[;] * * * [l]acks knowledge (common sennse [sic])[;] [d]oes not appear able to correct this." In the same evaluation, the Plaintiff was described as unimaginative, easily irritated and sometimes tactless, with a personality that was unsatisfactory for her job. Overall, Fort considered her performance to be "definitely unsatisfactory."

On December 1, 1991, a further evaluation of the Plaintiff was completed by Sergeant John Drennan ("Drennan"), who subsequently assumed the office of the Chief of Police following Fort's retirement. Drennan concluded that, while the Plaintiff was motivated and knowledgeable, she appeared to have an erroneous conception of the proper relationship between a Police Officer and the public

only seek leave of the Court to assert claims for punitive damages arising from causes of action which are founded upon the Laws of the State of Minnesota. Accordingly, the Court's authorization was not essential for the Plaintiff's assertion of the punitive damage claims which were attendant to her Federal causes of action.

2. We note that, when the Plaintiff was discharged on January 12, 1992, the City took the position that the Plaintiff was a probationary employee who was not entitled to request arbitration. Upon the City's refusal to arbitrate the propriety of her termination of employment, the

Plaintiff's Union sought arbitration and commenced an action, in the State District Court, to compel arbitration. The State District Court found that the Plaintiff was a probationary employee and, accordingly, stayed the arbitration proceedings. On appeal, this stay was upheld by the Minnesota Court of Appeals on March 9, 1993. See, *In re Law Enforcement Labor Services, Inc. v. City of Crosby*, 497 N.W.2d 308 (Minn. App.1993) (holding that collective bargaining agreement savings clauses preserved probationary employee's legal and constitutional rights but did not create right to arbitrate dismissal).

in a small community. He believed, however, that the Plaintiff would probably make an excellent State Trooper or Police Officer in a larger city.

On January 9, 1992, when the Plaintiff continued to show a lack of improvement, Fort appeared before the City's Police Commission to recommend the Plaintiff's dismissal. The Commission, which consisted of three Commissioners, reviewed the documentation presented by Fort and concurred in his request that she be dismissed. Only Fort and the three Commissioners were present at the meeting. Thereafter, on January 12, 1992, Fort notified the Plaintiff that she was being dismissed.[3] When she pressed him for a reason, Fort declined to elaborate.[4]

The Plaintiff frames her action as alleging a claim, under Title 42 U.S.C. § 1983, that the City deprived her of her constitutional right to due process of law, and as asserting a charge that the City has practiced unlawful sex discrimination in violation of Title VII of the Civil Rights Act of 1964. *Title 42 U.S.C. § 2000e–2*. The Plaintiff also asserts a claim, under Title 42 U.S.C. § 1983, against each of the individual Defendants premised upon a purported conspiracy to deny her due process of law as well as her rights under Title VII.

In addition, a number of State causes of action are included in her Complaint, and are within the supplemental jurisdiction of this Court. *Title 28 U.S.C. § 1367*. For example, the Plaintiff alleges that the City violated the Minnesota Human Rights Act ("MHRA"), *Minnesota Statutes Section 363.03, Subdivision 1*; that Fort, Ferrari, and LaPlant aided and abetted the City in discriminating against the Plaintiff on the basis of her sex, in violation of Minnesota Statutes Section 363.03, subdivision 6; and that the individual Defendants defamed the Plaintiff and tortiously interfered with her employment contract with the City.

Subsequent to the filing of her Motion for leave to amend her Complaint, the Plaintiff moved the Court to compel LaPlant to disclose certain of his medical and psychological records. We address each of the Plaintiff's Motions in turn.

### III. *Discussion*

A. *The Plaintiffs' Motion to Amend her Complaint to Assert a Claim for Punitive Damages.*

■ 1. *Standard of Review.* In the Federal Courts of this District, the pleading of a punitive damage claim, under causes of action premised upon the Laws of the State of Minnesota, must generally conform to the requisites of Minnesota Statutes Sections 549.191 and 549.20. *Security Savings Bank v. Green Tree Acceptance, Inc.*, 739 F.Supp. 1342, 1352 (D.Minn.1990); *Kuehn v. Shelcore, Inc.*, 686 F.Supp. 233 (D.Minn.1988); *Fournier v. Marigold Foods, Inc.*, 678 F.Supp. 1420, 1422 (D.Minn.1988).[5] As recognized by

---

**3.** Whether the Plaintiff remained a probationary employee at the time of her dismissal, which occurred some eight months after she commenced her employment, remains a contested issue. According to the provisions of the applicable collective bargaining agreement, the probationary period extends for a period of one year, but the Plaintiff contends that certain Rules, that have been promulgated by the City for termination of Police Officers, create a probationary period of six months and preempt any conflicting terms of the labor agreement. In turn, the Defendants argue that a relitigation of that issue is precluded, on *res judicata* grounds, as a result of the Minnesota Court of Appeals' determination that the Plaintiff was a probationary employee at the time of her dismissal. To this, the Plaintiff counters by arguing that her Union lacked the incentive to fully and fairly litigate the issue on her behalf.

While we find the issue intriguing, we need not reach it, as the determination of the Plaintiff's employment status, at the time of her discharge,

does not appear to be germane to any of the issues that we must resolve.

**4.** We defer our recitation of other facts, which we regard as bearing upon the Motions before us, to our analysis of the specific arguments that the Plaintiff advances in support of her Motion to amend her Complaint.

**5.** *Security Savings Bank v. Green Tree Acceptance, Inc.*, 739 F.Supp. 1342, 1352 (D.Minn.1990), *Kuehn v. Shelcore, Inc.*, 686 F.Supp. 233 (D.Minn.1988) and *Fournier v. Marigold Foods, Inc.*, 678 F.Supp. 1420, 1422 (D.Minn.1988), each involved State causes of action which were considered under the Court's diversity of citizenship jurisdiction. *Title 28 U.S.C. § 1332*. The rationale of these decisions related to the need, under the precepts of Federalism, to curtail or prevent forum shopping. See, *Kuehn v. Shelcore, Inc.*, supra (nonenforcement of Section 549.191 would influence the choice of the forum, since party might seek tactical advantage).

our Court, the Minnesota Legislature adopted, in 1986, the pleading requirements of Section 549.191 in order to deter certain practices in the presentment of punitive damage claims which were thought to be abusive, and in order to address a perceived insurance crisis. See, *Gobuty v. Kavanagh,* 795 F.Supp. 281, 287 (D.Minn.1992); *Kuehn v. Shelcore, Inc.,* supra at 234; *Filz v. Mayo Foundation,* 136 F.R.D. 165, 174 (D.Minn. 1991).

■ As a consequence of the enactment of Section 549.191, a plaintiff who seeks to assert a punitive damage claim must first obtain leave of the Court based upon a *prima facie* showing of entitlement. The plaintiff is not required to demonstrate an entitlement to punitive damages *per se,* but only an entitlement to allege such damages. *Fournier v. Marigold Foods, Inc.,* supra; *McKenzie v. Northern States Power Co.,* 440 N.W.2d 183, 184 (Minn.App.1989).

As Section 549.191 makes clear, "if the court finds prima facie evidence in support of the motion, the court shall grant the moving party permission to amend the pleadings to claim punitive damages." *Minn.Stat. § 549.-191.* The Minnesota Courts have determined that "[p]rima facie evidence is that evidence which, if unrebutted, would support a judgment in that party's favor." *Swanlund v. Shimano Indus. Corp., Ltd.,* 459 N.W.2d 151, 154 (Minn.App.1990), rev. denied (October 5, 1990); *McKenzie v. Northern States Power Co.,* supra. The same Courts have also noted that "prima facie" does not refer to a quantum of evidence but, rather, to a procedure for the winnowing of nonmeritorious punitive damage claims. *Id.*

■ Simply put, under the strictures of Section 549.191, the Court reviews the evidence in support of a Motion to Amend as

the Court would review a Motion for a Directed Verdict—now denominated in the Federal Rules of Civil Procedure as a Motion for the Entry of Judgment as a matter of law. See, *Rule 50(a), Federal Rules of Civil Procedure; Swanlund v. Shimano Indus. Corp., Ltd.,* supra ("Minn.Stat. § 549.191 essentially requires the trial court to direct a portion of the verdict against the plaintiff if the evidence of willful indifference is insufficient"). Thus, in reaching such a determination, the Court makes no credibility rulings, nor does the Court consider any challenge, by cross-examination or otherwise, to the Plaintiff's proof. *Id.* supra.

■ Moreover, in evaluating the existence of a *prima facie* showing for the assertion of a claim for punitive damages, the Court must recognize that "punitive damages do not 'belong' to the plaintiff in the same sense as compensatory damages." *Hodder v. Goodyear Tire & Rubber Co.,* 426 N.W.2d 826, 837 (Minn.1988), cert. denied, 492 U.S. 926, 109 S.Ct. 3265, 106 L.Ed.2d 610 (1989). Punitive damages are intended to punish a defendant, or to make an example of a defendant's wrongdoing, and not to compensate the plaintiff who has already been compensated. *Id.* As a consequence, punitive damages may only be awarded when a defendant's conduct reaches a threshold level of culpability.

■ As amended in 1986, Minnesota Statutes § 549.20 provided, in pertinent part:
> Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show a willful indifference to the rights or safety of others.

*Id.*

The term "willful indifference" has not been statutorily defined. Nevertheless, in *Wirig v. Kinney Shoe Corp.,* 461 N.W.2d 374, 381

---

As we have noted elsewhere, our jurisdiction is not premised upon diversity of citizenship but, rather, upon our Federal question jurisdiction. In a strict sense, when one chooses to litigate a Federal civil rights claim in the Federal Courts, the potentially fractious interests of forum shopping are negligible. Nevertheless, we find no persuasive basis to suggest that State claims, which have been joined in a Federal question Complaint, should be exempted from the dictates of Section 549.191, when similar claims, present-

ed to the Court under the aegis of our diversity jurisdiction would not be similarly excepted. Thus, we conclude that the prerequisites of Section 549.191 are equally applicable to State law causes of action which are litigated in the Federal Courts of Minnesota, irrespective of whether the Court's jurisdiction is invoked by the diversity of the parties citizenship or by the tenets of this Court's supplemental jurisdiction. See, *Daines v. City of Mankato,* 754 F.Supp. 681, 704 n. 9 (D.Minn.1990).

(Minn.1990), the Minnesota Supreme Court provided the following insight:

> Willful indifference is not equivalent to common law malice in a defamation action. Common law malice in this context has been defined as making the statement "from ill will and improper motives, or causelessly and wantonly for the purpose of injuring the plaintiff." * * * Willful indifference does not imply a purpose of actually intending to harm the plaintiff, but a knowing disregard of the plaintiff's rights or safety.

*Id.,* see also, *Mrozka v. Archdiocese of St. Paul and Minneapolis,* 482 N.W.2d 806, 812 (Minn.App.1992), rev. denied (May 15, 1992).

As a consequence, the mere existence of negligence or of gross negligence does not rise to the level of willful indifference so as to warrant a claim for punitive damages. *Wirig v. Kinney Shoe Corp.,* supra at 381; *Herbst v. Northern States Power Co.,* 432 N.W.2d 463, 469 (Minn.App.1988), rev. denied (February 10, 1989); *State by Woyke v. Tonka Corp.,* 420 N.W.2d 624, 629 (Minn.App.1988), rev. denied (May 4, 1988); *Utecht v. Shopko Dept. Store,* 324 N.W.2d 652, 654 (Minn. 1982).

Subsequently, in 1990, the Minnesota Legislature amended Section 549.20, by replacing the phrase "willful indifference" with "deliberate disregard." [6] This substitution of terminology became effective on May 4, 1990, so as to require the application of the deliberate disregard terminology to causes of action that should arise after that date. See, *1990 Minn.Laws, ch. 555, § 15, subd. 1(a), 1990 Minn.Laws 1557, 1563, codified at Minnesota Statutes Section 549.20, Subdivision 1(a) (1990).* The term "deliberate disregard" was comprehensively defined in the amended statute, as follows:

> (b) A defendant has acted with deliberate disregard for the rights or safety of others if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and:
>
>> (1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or
>>
>> (2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.

*Minnesota Statutes Section 549.20, Subdivision 1(b).*

Since the Plaintiff's cause of action focuses upon conduct which allegedly occurred after May 4, 1990, we are obligated to apply the "deliberate disregard" standard.

■ Under the deliberate disregard standard, the Court is obliged to search for evidence which is "clear and convincing." To be "clear and convincing," there must be "more than a preponderance of the evidence but less than proof beyond a reasonable doubt." *Weber v. Anderson,* 269 N.W.2d 892, 895 (Minn.1978). Where the evidence is sufficient to permit the Jury to conclude that it is "highly probable" that the defendant acted with deliberate disregard to the rights or safety of others, the "clear and convincing" standard would be satisfied. See, e.g., *Becker v. Alloy Hardfacing & Engineering Co.,* 401 N.W.2d 655, 659 (Minn.1987); *Swanlund v. Shimano Indus. Corp., Ltd.,* supra.

■ In the final analysis, when presented with a Motion for leave to assert a punitive damage claim, the function of the Court is to do more than "rubber stamp" the allegations in the Motion papers. The Court must independently ascertain whether there exists *prima facie* evidence that the defendant acted

---

**6.** As amended, Section 549.20, Subdivision 1(a) reads as follows:

Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others. Since the Minnesota Supreme Court had defined "willful indifference" as essentially amounting to a "knowing disregard," *Wirig v. Kinney Shoe Corp.,* 461 N.W.2d 374, 381 (Minn.1990), it re-

mains unclear what substantive modification, if any, was effectuated by the 1990 Amendment to this Statute. We do note that, without much in the way of an explanation, the Minnesota Court of Appeals has characterized the new standard as a "heightened" one. See, *Bougie v. Sibley Manor, Inc.,* 504 N.W.2d 493, 500 n. 4 (Minn.App. 1993); *Hanks v. Hubbard Broadcasting, Inc.,* 493 N.W.2d 302, 311 n. 3 (Minn.App.1993), rev. denied (February 12, 1993).

with a deliberate disregard of the rights or safety of others. *Swanlund v. Shimano Indus. Corp., Ltd.,* supra; *Shetka v. Kueppers, Kueppers, Von Feldt & Salmen,* 454 N.W.2d 916, 918 n. 1 (Minn.1990).

2. *Legal Analysis.* For the sake of clarity, we separately address the Plaintiff's Motion to amend as it relates to each of the Defendants. Given the commonality of the factual and legal issues, our analysis requires us to consider somewhat repetitive arguments. Consequently, to the extent that we may intelligibly do so, we will address the Plaintiff's individualized claims with minimal replication.

a. *The Plaintiff's Claim for Punitive Damages Against LaPlant.*

The Plaintiff asserts that she has proffered a *prima facie* showing that clear and convincing evidence will support her claim that LaPlant deliberately disregarded her rights and interests. After a thorough review of the evidence which reflects upon LaPlant's conduct, we disagree.

(1) *The Plaintiff's Claim Against LaPlant for Aiding and Abetting Sex Discrimination.*

 In piecing together the fabric of her *prima facie* showing, the Plaintiff first contends that LaPlant intentionally treated her differently than he did the other Officers assertedly because of his negative attitude towards women. The Plaintiff supports this contention by a statement that LaPlant made, on the first day that they rode together, that he wished that she were not a woman. As well, it was the Plaintiff's surmise that LaPlant's divorce had adversely affected his general perception of women. These influences combined—the Plaintiff contends— to explain why LaPlant treated her "differently from the first day," and why he refused to give her a chance to show him that she was "a good officer." *Warner Affidavit,* Exhibit 6 ("Ulrich Deposition"), at 75. Synop-

sized, the following exchange summarizes the Plaintiff's proof in this respect:

Q: * * * You say that he treated you differently?

A: As far as I'm concerned, yes.

Q: How did he treat you differently?

A: Just in general, day by day. He started off with a negative attitude towards me. Obviously he's not going to treat me like he treats Ray. He doesn't have a negative attitude towards Ray to begin with, but he does with me.

*Ulrich Deposition,* at 75.

Although the Plaintiff generally complains of LaPlant's differential attitude and demeanor, the only allegation of LaPlant's disparate treatment of the Plaintiff, in specific terms, is cast as an unwillingness on his part to accept the Plaintiff's constructive criticism.

As such, we are unable to conclude that clear and convincing evidence currently undergirds the Plaintiff's assertion that LaPlant has aided and abetted her employer's conduct, which she regards as sexually discriminatory, nor can we conclude that she will amass such an evidentiary showing by the time of trial. Under Minnesota Statutes Section 363.03, subdivision 6, an individual can be liable if he or she is found to have intentionally aided, abetted, incited, compelled or coerced another to engage in a forbidden employment practice under the MHRA,[7] or attempted to do so. The Plaintiff's showing—which we accept at face value for these purposes—that LaPlant personally preferred to work with male Officers is insufficient to demonstrate any intent to assist others in performing an unlawful discriminatory act, as is his rejection of her criticisms, constructive or otherwise. We need not and do not decide if her showing presents an actionable claim; for our purposes, it is sufficient to note that the claim—if viable—fails to rise to a level of culpability which warrants a claim for punitive damages.[8]

7. Obviously, the most pertinent prohibition under the Minnesota Human Rights Act ("MHRA") would be that which forbids an employer from discharging an employee on the basis of sex. *Minnesota Statutes Section 363.03, Subdivision 1, Paragraph 2(b).*

8. Our inquiry under Section 549.20 focuses on whether the Plaintiff has sufficiently alleged that LaPlant acted in deliberate disregard of her rights. See, *Minnesota Statutes Section 549.20* (requiring clear and convincing evidence that acts of defendant show deliberate disregard). LaPlant's attitude of disdain toward women,

As an additional showing, the Plaintiff has proffered LaPlant's letter to the Police Commission, which reports an incident in which the Plaintiff was said to have jokingly pointed her service revolver at his head, as demonstrating his complicity in her wrongful discharge. While the evidence is both clear and convincing that LaPlant wrote the assertedly offensive letter, there is no evidence, however circumstantial, that the letter was motivated by a discriminatory intent. Again, we do not suggest that the letter is not evidence of a plot to end the Plaintiff's employment on the City's Police force, but we do conclude that the letter has any number of conceivable purposes, many of which further entirely legitimate business, governmental and societal interests. Without a clear and convincing showing that the letter was the product of an unlawful complicity, in violation of Section 363.03, Subdivision 6, a claim for punitive damages on such an infirm basis is unwarranted. Accordingly, leave to allow the pleading of a punitive damage claim arising from LaPlant's purported violation of the MHRA's "aiding and abetting" proscriptions is denied.[9]

(2) *The Plaintiff's Claim Against LaPlant for Common Law Defamation.*

The Plaintiff also contends that LaPlant acted in deliberate disregard of her rights when he submitted his appraisal of her competency to be a Police Officer to Fort for transmittal to the Police Commission which, at the time, was considering her continued employment on the City's Police Force. According to the Plaintiff, LaPlant's evaluation of her job performance was tainted with defamatory statements, including his reference to the "gun to the head" prank. The Plaintiff denies any such occurrence, whether performed jokingly or otherwise. We are again obligated to appraise this evidence under the focus of the criteria by which punitive damages may be pled.

Under Minnesota law, in order for a statement to be considered defamatory, it must be communicated to someone other than the Plaintiff, it must be false, and it must tend to harm the Plaintiff's reputation or to lower her estimation in the community. *Stuempges v. Parke, Davis & Company*, 297 N.W.2d 252, 255 (Minn.1980). As is the case here, allegedly defamatory statements which would affect the Plaintiff in her business, trade or profession are slanderous *per se* and actionable even in the absence of any actual damage. *Id.*

Nevertheless, not every statement, even those which may be personally disparaging to a plaintiff are actionable as defamatory. As but one example, statements that are legitimately expressed in a business, employment or professional context may be insulated from suit by virtue of a qualified privilege. Whether a privilege exists is a question of law for the Court's determination. *Conerly v. CVN Companies, Inc.*, 785 F.Supp. 801, 811 (D.Minn.1992); *Lewis v. Equitable Life Assurance Soc.*, 389 N.W.2d 876, 889 (Minn.1986). In this respect, the law of Minnesota provides:

[A] communication, to be privileged, must be made on a proper occasion, from a proper motive, and must be based upon reasonable or probable cause. When so made in good faith, the law does not imply malice from the communication itself, as in the ordinary case of libel. Actual malice must be proved, before there can be a recovery, and in the absence of such proof the plaintiff cannot recover.

*Lewis v. Equitable Life Assurance Soc.*, supra at 889 (quoting *Stuempges v. Parke, Davis & Co.*, supra at 256–57).

In applying this privilege, the Courts have determined that an employee's response to a supervisor's request for an evaluation of a

---

even if firmly undisputed, would not be the sort of offense that was proscribed by the Minnesota Legislature unless it included conduct, demonstrated by clear and convincing evidence, that he had acted upon those beliefs in disregard of the Plaintiff's rights.

9. Although we recognize certain parallels between our analysis and that which might be implicated in a consideration of a dispositive Motion on the aiding and abetting claim—or as to any of the Plaintiff's other claims—we do not reach issues that are not properly before us and, necessarily, we defer any such analysis to the United States District Court, the Honorable James M. Rosenbaum presiding, where certain of those issues are presently pending.

coworker's job performance is entitled to a qualified privilege so long as the evaluation was made for a proper purpose and upon a proper occasion. *Lee v. Metropolitan Airport Commission*, 428 N.W.2d 815, 819–20 (Minn.App.1988).[10] Since LaPlant's letter, and the statements it contained, were prepared in response to his employer's request for review by the Police Commission, they would undoubtedly fall within the qualified privilege recognized in Minnesota.

■ A qualifiedly privileged statement is not entirely exonerated from a potential liability claim, however, since the privilege may be eviscerated by a showing of actual malice. See, *Yeldell v. Tutt*, 913 F.2d 533, 541 (8th Cir.1990); *Conerly v. CVN Companies, Inc.*, supra at 811–12; *Meleen v. Hazelden Foundation*, 740 F.Supp. 687, 693 (D.Minn.1990), aff'd., 928 F.2d 795 (8th Cir.1991); *Steinbach v. Northwestern Nat. Life Ins. Co.*, 728 F.Supp. 1389, 1396 (D.Minn.1989); *Frankson v. Design Space Int'l*, 394 N.W.2d 140, 144 (Minn.1986); *Lewis v. Equitable Life Assurance Soc.*, supra at 890. "Actual malice" is defined as "actual ill will, or a design to causelessly and wantonly to injure plaintiff." *McBride v. Sears, Roebuck & Co.*, 235 N.W.2d 371, 375 (Minn.1975).

■ We find in this Record, no showing, let alone one by clear and convincing evidence, that LaPlant had actual ill will—a baseless and reckless interest in causing injury—toward the Plaintiff. We understand that LaPlant expressed a preference for male

Police Officers during his first occasion to work with the Plaintiff, and that the circumstances of his divorce may well have dampened his veneration for women generally, but matters of individual, personal preference, without more, do not translate into a showing of maliciousness.[11] We will not authorize a claim for punitive damages on nothing more than surmise, even though that surmise may be genuinely held. Our standard for such a claim remains one of "clear and convincing" evidence.

Moreover, any suggestion that LaPlant's malice is facially demonstrated by his purportedly defamatory statements is untenable. We understand the Plaintiff to be arguing that LaPlant maliciously fabricated the gun-pointing incident in an effort to secure her dismissal, but there is a dearth of clear and convincing evidence to that effect. We are aware of no departmental investigation or discipline which was triggered by the report of this incident, nor is the evidence before us unequivocal as to its occurrence. Our review of LaPlant's deposition testimony has been effectively precluded by its editorially truncated state. See, *Warner Affidavit, Exhibit 10* ("LaPlant Deposition") (pp. 7–12, 78–83, 114–125).[12] In sum, whether or not the incident occurred remains an issue for a factfinder but, as pertinent to our inquiry here, the Record is devoid of that degree of certitude in the Plaintiff's proof of LaPlant's maliciousness, such as would sustain a claim for punitive damages.[13] Accordingly, we deny the

10. In the context of an employer's investigation of employee misconduct, the Minnesota Supreme Court has held:

Communications between an employer's agents made in the course of investigating or punishing employee misconduct are made upon a proper occasion and for a proper purpose, as the employer has an important interest in protecting itself and the public against dishonest or otherwise harmful employees.

*McBride v. Sears Roebuck & Company*, 306 Minn. 93, 235 N.W.2d 371, 374 (1975).

11. We recognize that the Plaintiff may well be able to convince the factfinder that the circumstances, when taken as a whole, are sufficient to reasonably infer discriminatory conduct, but that issue is not before us. Here, we need only consider the Plaintiff's entitlement to plead punitive damages and, as to that issue, the Plaintiff's proof fails.

12. We underscore our frustration with the sparseness of the record before us which relates to the gun-pointing incident. Of the extracts from LaPlant's Deposition which were filed with us, it appears that the questioning on Page 78 immediately follows a description of the incident—on pages which had not been filed with the Court—and the interrogation at page 125 terminates at a point where the specifics of the incident would appear to have been forthcoming. Those subsequent pages were also omitted in the submissions. We applaud the use of extracts and excerpts so long as they further our consideration of the issues which, unfortunately, was not the case here.

13. Any suggestion that LaPlant's actual malice in writing the letter may be presumed, somehow, from the fact that the letter was written is undermined by the full text of that letter. As there expressed, LaPlant stated his "bottom line opin-

Plaintiff's request to plead a claim for punitive damages attributable to her allegation that LaPlant has defamed her.

### (3) The Plaintiff's Claim Against LaPlant for Tortious Interference.

Lastly, the Plaintiff seeks leave to allege a claim for punitive damages which arises from her tortious interference claim. Here, again, the requisite *prima facie* showing, of a deliberate indifference on LaPlant's part, has not been made.

■■■■ To be successful in claiming a tortious interference with an employment contract in the State of Minnesota, a party must prove the following essential elements:

(1) existence of a contract; (2) defendant knew of the contract; (3) defendant intentionally procured a breach of the contract without justification; (4) plaintiff suffered injuries as a direct result of the defendant's actions.

*H Enterprises International v. General Electric Corp.*, 833 F.Supp. 1405, 1419 (D.Minn. 1993); *James M. King & Assoc., Inc. v. G.D. Van Wagenen Co.*, 717 F.Supp. 667, 679 (D.Minn.1989); *Bouten v. Richard Miller Homes, Inc.*, 321 N.W.2d 895, 900 (Minn. 1982).

Under Minnesota law, however, a party may not be held liable for tortiously interfering with his own contract. *Nordling v. Northern States Power Co.*, 478 N.W.2d 498, 505 (Minn.1991); *Bouten v. Richard Miller Homes, Inc.*, 321 N.W.2d 895, 900–01 (Minn. 1982). As the Minnesota Supreme Court explained in *Nordling*:

If a corporation's officer or agent acting pursuant to his company duties terminates or causes to be terminated an employee, the actions are those of the corporation; the employee's dispute is with the company employer for breach of contract, not the agent individually for a tort.

*Id.* at 505.

Since LaPlant acted as an agent of the City, which was also the Plaintiff's employer, any promotion by him of the Plaintiff's termination would, ordinarily, be exempted from a tortious interference claim. Notwithstanding that general exemption, however, in both *Nordling* and *Bouten*, the Minnesota Supreme Court recognized that the agent of the employer may be liable for tortious interference, when that agent has acted "outside the scope of his or her duties." *Nordling v. Northern States Power Co.*, supra at 506; *Bouten v. Richard Miller Homes, Inc.*, supra at 901.[14]

As a consequence, the critical issue turns on whether LaPlant acted in the course of his employment duties when he is purported to have bolstered the Plaintiff's termination. Given the Record before us, we find it unmistakably clear that, in submitting his letter appraisal of the Plaintiff's job performance, LaPlant was honoring the request of his employer that such an appraisal be prepared and, accordingly, he was acting within the scope and course of his employment duties.[15] Therefore, we are also compelled, by the Record before us, to deny the Plaintiff's request to plead a punitive damages claim with respect to her tortious interference claim against LaPlant.

---

ion" that "it is sad that what is being done on an administrative level to her has to be done." *Warner Affidavit, Exhibit 1* [emphasis in original]. While this may be a mere subterfuge for LaPlant's real intent to harm the Plaintiff, no evidence of such an intent has been clearly and convincingly presented by the Plaintiff.

**14.** Borrowing concepts from the Restatement (Second) of Torts, § 766, the *Nordling* Court described this "beyond-the-scope of employment" exception as being rooted in the principle that interference could only be tortious if done without legal justification or privilege. See, *Johnson v. Radde*, 293 Minn. 409, 196 N.W.2d 478, 480 (Minn.1972). More specifically, the *Nordling*

Court concluded that if the alleged tortfeasor had job duties which included the supervision of the terminated employee or the evaluation of that employee's performance, the supervisor would be justified, or privileged, to participate in the termination decision without incurring an exposure to liability. *Nordling v. Northern States Power Co.*, 478 N.W.2d 498, 506 (Minn.1991).

**15.** To the extent that the "scope-of-employment" privilege may be destroyed if the Defendant had acted with malice, cf., *Nordling v. Northern States Power Co.*, supra, we merely note our previous discussion which recognized a want of clear and convincing evidence which would demonstrate any actual malice on LaPlant's part.

### b. *The Plaintiff's Claim for Punitive Damages Against Ferrari.*

The Plaintiff seeks permission to allege punitive damages against Ferrari for the same causes of action which she has asserted against LaPlant. With some minor exceptions, the same reasoning which led to our denial of such permission as to LaPlant applies equally to the claims against Ferrari.

### (1) *The Plaintiff's Claim Against Ferrari for Aiding and Abetting Sex Discrimination.*

■ In support of this aspect of her Motion, the Plaintiff appears to have pinioned her *prima facie* showing not upon the actions of Ferrari, but upon certain comments he has made to her, and to others, over a period of several years. In particular, the Plaintiff alleges that Ferrari had expressed his skepticism that a woman could successfully perform the duties of a Police Officer and, apparently on one occasion, had stated that he would not jeopardize his life in order to protect a female Officer. In this same vein, the Plaintiff notes that, after she was hired, Ferrari had allegedly commented that it was more difficult to work with a female Officer because of the added concern of having to protect her as well as himself. On another occasion, after the Plaintiff had called for some backup assistance, Ferrari is reported to have commented that he did not need any aid because he was "a man." *Ulrich Deposition*, at 157.[16] While we do not condone the statements which the Plaintiff has attributed to Ferrari, they are insufficient to warrant a punitive damages claim and, we note, the Plaintiff does not advance any authority which hold to the contrary.

Absent from the Plaintiff's allegations, much less her proof, is any evidentiary showing that Ferrari failed to protect her, avoided dangerous exposures at her expense, or demonstrated any unwillingness to protect her. Indeed, her *prima facie* showing is founded upon Ferrari's generalized comments which, if accurate, may well suggest some disenchantment with gender neutral employment practices. Nevertheless, in the absence of some effectuation of that disenchantment in a way that adversely impacted upon the Plaintiff, we see no basis to conclude that Ferrari deliberately disregarded the Plaintiff's right to be free from sexual discrimination. We recognize the Plaintiff's contention that Ferrari acted out his discriminatory intentions by criticizing the Plaintiff's job performance in letter form, but we find no evidence to suggest that the letter was provoked by a discriminatory intent, nor is the evidence sufficient, under the rubric of the "clear and convincing" standard, to reasonably draw any such inference. As we have otherwise noted, we are not called upon to determine if the Plaintiff's claim states a cause of action, but we are obliged to fully examine the evidence for any showing of deliberate disregard, and we find that showing to be wholly inadequate.[17] Accordingly, in the absence of an adequate *prima facie* showing, the Plaintiff's Motion to plead a claim for punitive damages, attributable to her allegation that Ferrari had aided and abetted discriminatory conduct, is denied.

### (2) *The Plaintiff's Claim Against Ferrari for Common Law Defamation and Tortious Interference.*

We reject the Plaintiff's request to assert punitive damages against Ferrari, as to her claims of defamatory and tortious conduct, for reasons expressed in our consideration of the same claims against LaPlant. We find no clear and convincing showing that Ferrari

---

16. The Plaintiff also testified in her deposition that on one occasion Ferrari commented about a female assault victim, "the bitch probably deserved it." *Ulrich Deposition*, at 166. The Plaintiff has not alleged facts, however, that indicate that this comment had any tangential connection with his actions or treatment of her or of her employment with the City. If the statement is true, it does not reflect well on Ferrari, but we find no basis to permit a claim for punitive damages merely because an unkind and insensitive statement is made about one who is not the Plaintiff.

17. While not entirely compelling, we do note that Ferrari's letter appraisal of the Plaintiff addressed both her strengths and her weaknesses as a Police Officer in a small town. His discussion of the Plaintiff's interpersonal difficulties, her problems with authority and her rejection of advice, are corroborated by other evidence in the Record. We do not suggest that the letter was, necessarily, balanced in its approach, but it also suggests no sexually discriminatory motivation—at least clearly and convincingly.

defamed the Plaintiff or that, if he did, his statements were not qualifiedly privileged. Nor has the Plaintiff proffered any showing that Ferrari bore her such actual malice as to overcome the privileged nature of his evaluatory comments.[18]

As to the tortious interference claim against Ferrari, the discussion relating to LaPlant's immunity from suit is fully applicable to Ferrari, who also acted within the scope of his employment in responding to Fort's directive that he submit an evaluatory report to the Police Commission concerning the Plaintiff's job performance. There being no showing of malice—such as would abrogate his "scope-of-employment" privilege— we find no warrant for the assertion of a punitive damages claim on these grounds, and the Plaintiff's request for the same is denied. *Nordling v. Northern States Power Co.,* supra.

c. *The Plaintiff's Claim for Punitive Damages Against Fort.*

As was the case with LaPlant and Ferrari, a triad of aiding and abetting, defamation and tortious interference claims underlie her request to seek punitive damages against Fort. Although we regard the *prima facie* showing as to Fort somewhat more colorable, it, too, fails to satisfy the degree of culpability that is essential to the commencement of a punitive damages claim.

(1) *The Plaintiff's Claim Against Fort for Aiding and Abetting Sex Discrimination.*

 Notwithstanding her identification of a number of instances in which she believes that she was the victim of Fort's disparate treatment,[19] the Plaintiff focuses her "aiding and abetting" allegations on Fort's decision to terminate her, and upon his conduct before and during the Police Commission's meeting. This conduct, she claims, reflects clear and convincing evidence of Fort's deliberate disregard of her right to be free from the effects of sex discrimination in the workplace. In formulating this *prima facie* showing, the Plaintiff principally relies upon the following circumstances.

First, after Fort decided to advocate her employment discharge, he went to LaPlant and Ferrari to request that they present their appraisal of her job performance in writing. In the Plaintiff's view, Fort did not solicit comments from the other Officers or staff, but resorted to LaPlant and Ferrari because he knew that they would provide an unfavorable commentary.

Second, when he appeared before the Police Commission, Fort maintained that the Plaintiff's demonstrated inability to work with her fellow Officers made it impossible for the Police Force to operate successfully. However, on past occasions when male Officers quarreled in the workplace, Fort merely directed them to resolve their differences on their own, and did not invoke any formal disciplinary action. Moreover, the Plaintiff maintains that male Officers such as Drennan, Ferrari and LaPlant had histories of more serious employment problems which did not lead to their dismissal. The Plaintiff asserts that a pattern of discrimination is exemplified by the lenient treatment accorded to Ferrari, who had received prior suspensions for insubordination and for conduct un-

---

18. Although the Plaintiff complains that Ferrari did not chastise the local citizenry who threatened her, the evidence does reflect that, during the time in which the Plaintiff was most concerned about these personal threats, Ferrari insisted upon following her home in order to ensure her safety. *Ulrich Deposition,* at 180. In its totality, the evidence of actual malice on Ferrari's part is thoroughly inappreciable.

19. By way of examples, the Plaintiff alleges that, after a disagreement, Fort singled her out and required her to solicit negative performance reviews from her colleagues and from the Department's support staff. According to the Plaintiff, Fort informed her that the exercise was intended to be a degrading experience. Since male Police Officers had not been instructed to do the same, the Plaintiff concludes that gender played a role in the differential treatment.

On another occasion, Fort instructed the Plaintiff not to visit the Spalding Bar, which was a local tavern that the male Officers were permitted to frequent on their own personal time. Fort is also accused of denying the Plaintiff an opportunity to speak at a local school, while allowing a male Officer to participate despite what the Plaintiff thought were her superior qualifications. Again, in the Plaintiff's estimation, these events could only be explained in terms of gender discrimination.

becoming an Officer, but who, nevertheless, had been retained on the Force.

Third, the Plaintiff alleges that Fort was so unwilling to listen to the suggestions of Carol Mills ("Mills"), who was one of the three Police Commissioners, that he quickly dismissed her idea of an extension of the Plaintiff's probationary period, by accusing her of having sympathies which were motivated by her friendship with the Plaintiff. Despite the suggestion of Mills, Fort informed the Commission that dismissal was the only viable alternative.

Fourth, the Plaintiff alleges that Fort was deliberately indifferent to her rights under the City's affirmative action policy and that, at the time of his deposition, Fort was unable to describe affirmative action, was unaware of the details of the City's policy, and had not posted a copy of the policy at the Police headquarters.

Finally, the Plaintiff points to evidence that another Officer, Dean Savor, felt that Fort had created an "environment" within the Police Force which made it more difficult for a woman to succeed as an Officer.

Although this evidence is admittedly germane to the Plaintiff's claim that Fort aided and abetted the City in conduct which she regarded as discriminatory, that is not the issue before us. Our analysis is driven by the express requirement of Section 549.191 that clear and convincing evidence of Fort's deliberate disregard of her rights must either have been shown, or will be available for the factfinder's consideration at trial. Accordingly, we do not finitely appraise the evidence presented with mathematical precision, but we consider its impact in reflecting a level of blameworthiness on Fort's part, if any, that would allow the pleading of punitive damages.

When the Record before us is viewed in its entirety, we are not persuaded that clear and convincing evidence of Fort's deliberate disregard of the Plaintiff's rights can, with any reasonable degree of probability, be proven at trial. Undoubtedly, Fort was instrumental in persuading the Commission that the Plaintiff's employment as a Police Officer should be terminated. Nevertheless, he was equally instrumental in securing her employment in the first instance and, for a portion of her employment, he had evaluated her work performance in terms which were highly complimentary. Nor can we ignore the wealth of evidence that postulates alternative, nondiscriminatory bases for the Plaintiff's termination. The shortcomings in the Plaintiff's job performance are well-documented and were well-known prior to her discharge.[20] The evidence substantiates that the Plaintiff bridled at Fort's exercise of authority, that she questioned the wisdom of his actions with undiplomatic, if not caustic terminology. Given a full appreciation of this record, we are not left with a firm and telling impression that Fort's treatment of the Plaintiff was intentionally and deliberately in disregard of her right to a gender neutral work environment.

This view is not altered by Fort's apparent ignorance of the details of the City's affirmative action program. While not entirely compelling, we suspect that Fort's unfamiliarity with the provisions of the City's affirmative action policy forecasts an improbability that he could deliberately disregard rights to which he was, ostensibly, unaware.

Similarly, while the information Fort presented to the Police Commission was negative in its tone, this would be expected whenever a recommendation for dismissal was being proposed. Notably, there is no suggestion that the Chief presented the gender of the Plaintiff as an issue before the Com-

---

**20.** The Plaintiff's appreciation for these difficulties is amply demonstrated by her written response to Fort's request that she obtain performance evaluations from her colleagues, which stated, in part:

> You asked me to tell you whether the evaluations of me were fair and what I was going to do about them. * * * There were some very constructive comments made and I would like to bring those up now. First was mood swings. I admit that I have had some mood swings * * * Another comment was that I need to work on my patience. I again totally agree. The other very constructive comment was that I need to work on my relationship with other Officers. I think if you ask around I [have] been a very easy person to work with in [sic] the last month. This will continue. *Baker Affidavit*, Exhibit B.

mission, and the Plaintiff's work record could reasonably potentiate toward dismissal, without the slightest inference that any of the employment decisions were driven by prohibited gender considerations, much less that the impelling motivation was of a character to warrant exemplary or punitive damages. Accordingly, we deny the Plaintiff's request for leave to allege punitive damages as to this claim.

(2) *The Plaintiff's Claims Against Fort for Defamation and Tortious Interference.*

For the reasons expressed in our rejection of the Plaintiff's identical requests with respect to the defamation and tortious interference actions against Ferrari and LaPlant, we reject them as to Fort, as well.

■ Even if the Plaintiff were able to advance a *prima facie* showing that defamatory statements were made to the Police Commission by Fort, as the agent of her employer and as her supervisor, Fort was entitled to a qualified privilege with respect to those statements which he expressed in the course of an evaluation of her job performance. To our knowledge, no other statements are claimed to be defamatory. We acknowledge Fort's admission that he thought of the Plaintiff as a "spoiled brat," but that characterization does not ascend to the level of opprobrium which justifies a punitive damage claim.

Furthermore, since Fort's involvement in the Plaintiff's termination was a necessary adjunct to his employment duties, a tortious interference claim against him would be unavailing, at least in the absence of a showing of actual malice. No such showing, in clear and convincing terms, has been made here and, accordingly, we deny the Motion for

leave to plead a punitive damage claim. *Nordling v. Northern States Power Co.,* supra.

d. *The Plaintiff's Claim for Punitive Damages Against the City of Crosby.*

■ Ordinarily, a municipality is considered immune from an award of punitive damages. *Minnesota Statutes Section 466.-04, Subdivision 1; Wilson v. City of Eagan,* 297 N.W.2d 146 (Minn.1980); *Johnson v. Washington County,* 506 N.W.2d 632 (Minn. App.1993). However, the Minnesota Legislature has provided a statutory exception to this general rule with respect to claims brought against municipalities under the MHRA. *Minnesota Statutes Section 363.-071, Subdivision 2.*[21]

■ In considering this issue, we find instructive the authority in this District which suggests that claims for punitive damages, that have been brought under the MHRA, are outside the leave-to-amend requirements of Minnesota Statutes Section 549.191. See, *Daines v. City of Mankato,* 754 F.Supp. 681 (D.Minn.1990). In *Daines,* the Court concluded that a claim for punitive damages under the MHRA was not barred by the Plaintiff's failure to follow the Motion and Affidavit requirements of Section 549.-191. In the words of the Court:

Plaintiff argues that she is not required to comply with § 549.191 because her claim for punitive damages is being brought under the MHRA which incorporates § 549.-20, the substantive standard for awarding punitive damages, but does not require compliance with § 549.191. * * * The Court finds persuasive plaintiff's argument * * *. The protections against excessive punitive damages awards provided by

---

**21.** Section 363.071, Subdivision 2, provides, in pertinent part, as follows:

[T]he administrative law judge * * * may also order the respondent to pay an aggrieved party, who has suffered discrimination * * * punitive damages in an amount not more than $8,500. Punitive damages shall be awarded pursuant to section 549.20. In any case where a political subdivision is a respondent, the total of punitive damages awarded an aggrieved party may not exceed $8,500 and in that case if there are two or more respondents the punitive damages may be apportioned among them.

Punitive damages may only be assessed against a political subdivision in its capacity as a corporate entity and no regular or ex officio member of a governing body of a political subdivision shall be personally liable for payment of punitive damages pursuant to this subdivision. Should liability be contested in a Court proceeding instead of before an Administrative tribunal, the Trial Judge, and not a Jury, would hear and determine the issues of liability, damages, fees and costs, subject, of course, to the statutory limitation on the award of punitive damages. *Minnesota Statutes Section 363.14, Subdivision 2.*

§ 549.191 are not necessary in MHRA actions which are heard and decided by a hearing officer or judge. Also persuasive is the fact that the MHRA allows hearing officers or a judge to award various remedies regardless of whether the plaintiff requests some or all of them.

Although Section 549.191 does not admit of an exception to the pleading of a punitive damage claim in any action founded upon State law, the purpose and intent for the enactment of that provision has limited applicability in the context of a MHRA claim, where no more than $8,500 can be recovered in punitive damages, and where the amount of punitive damages, if any, will be determined by a Judge. Moreover, while the MHRA is specific in its incorporation of the standards of Section 549.20, the absence of an accompanying reference to Section 549.-191 is conspicuous in its suggestion that the Legislature was excluding such claims from the pleading regime of that Section. Thus, the *Daines* decision fairly implies that the Plaintiff need not have sought leave of the Court in order to incorporate a claim for punitive damages in her original Complaint. Since the Plaintiff did not so plead a punitive damage claim, however, our analysis may not end here.

■ Where, as here, a plaintiff seeks to amend her Complaint, Rule 15(a), *Federal Rules of Civil Procedure*, instructs that leave to amend shall be granted "when justice so requires." *Id.* In construing this provision, the United States Supreme Court has observed:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.— the leave sought should, as the rules require, be 'freely given.'

*Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

Thus, although we begin with a presumption of liberality, an amendment to a pleading can be successfully challenged on grounds of futility, if the claims created by the amendment would be unable to withstand a Motion to Dismiss. *Weimer v. Amen*, 870 F.2d 1400, 1407 (8th Cir.1989); *Holloway v. Dobbs*, 715 F.2d 390, 392–93 (8th Cir.1983); *Norbeck v. Davenport Community School Dist.*, 545 F.2d 63 (8th Cir.1976), cert. denied, 431 U.S. 917, 97 S.Ct. 2179, 53 L.Ed.2d 227 (1977); *Jeffers v. Convoy Co.*, 650 F.Supp. 315, 317 (D.Minn.1986); *Collyard v. Washington Capitals*, 477 F.Supp. 1247, 1249 (D.Minn.1979); but, cf., *Karl's Inc. v. Sunrise Computers, Inc.*, 901 F.2d 657, 660 (8th Cir.1990) ("colorable showing" sufficient to withstand application of clearly frivolous rule).

■ With this authority as a lodestar, we test the propriety of the Plaintiff's proposed punitive damage claim against the City according to the same precepts which have governed our analysis of the same type of claims against the individual Defendants. See *Minnesota Statutes Section 363.071, Subdivision 2* ("Punitive damages shall be awarded pursuant to Section 549.20."). In this circumstance, we do not believe that the Plaintiff has presented an adequate *prima facie* showing that the City deliberately disregarded the Plaintiff's right to a gender-free workplace. We are mindful of the Plaintiff's contention that the City was cavalier in its enforcement of a duly promulgated affirmative action policy. We also agree with the Plaintiff that, once promulgated, that policy received only minimal implementation by those charged with its enforcement. Nonetheless, the Plaintiff has failed to present any specific evidence that the City has acted with a deliberate disregard for her rights under that policy. In this respect, we understand the policy to provide, in part, as follows:

> Employees dismissed shall have the benefit of:
>
> a. Appropriate and progressive disciplinary measures as outlined in the Personnel Manual.
>
> b. An opportunity to have his/her dismissal reviewed by the City Clerk to determine if discriminatory practices were factors in his/her dismissal and to recommend a remedy if so justified.

*Warner Affidavit, Exhibit 1,* (Fort Deposition), Exh. 6, at 12.

Despite clear authorization to pursue a review of her dismissal before the City Clerk, we find no evidence before us that such remedial means were appropriately exhausted. Suffice it to say here, that a showing of the City's deliberate disregard of the Plaintiff's rights under the MHRA, or under the affirmative action policy, has not been advanced or supported by clear and convincing evidence.[22] Therefore, we deny the Plaintiff's Motion to amend her Complaint so as to allege a punitive damage claim against the City.

### B. *The Motion for an Order Compelling Discovery.*

On an unspecified date, the Plaintiff served Requests for the Production of Documents upon LaPlant, which sought the production of his mental health and his prescription drug records for the period from January 1, 1990 to the present. In the alternative, LaPlant was requested to complete an authorization for the release of these records by his medical care providers. In addition, the Plaintiff has requested the production of LaPlant's medical records which relate to the diagnosis and treatment of a kidney stone ailment for which he was treated in late 1991 and in early 1992. As noted, the Plaintiff has opposed these discovery requests on grounds of relevancy and privilege.

The Plaintiff's Requests for Production of Documents were submitted pursuant to Rule 34(a), Federal Rules of Civil Procedure, which provides as follows:

> Any party may serve on any other party a request (1) to produce and permit the party making the request, or someone acting on the requestor's behalf, to inspect and copy, any designated documents (including writings, drawings, graphs, charts, photographs, phono records, and other data compilations from which information can

be obtained, translated, if necessary, by the respondent through detection devices into reasonably usable form), or to inspect and copy, test, or sample any tangible things which constitute or contain matters within the scope of Rule 26(b) and which are in the possession, custody or control of the party upon whom the request is served * * *.

*Id.*, as amended, effective December 1, 1993.

Upon LaPlant's failure to produce these documents for inspection, or to complete authorizations for their release, the Plaintiff filed this Motion to Compel Discovery. See, *Rule 37(a), Federal Rules of Civil Procedure.* Given the impasse of the parties, our duty is to determine whether the Plaintiff's Request was proper, and whether LaPlant has any valid objection to producing the requested information.

 LaPlant argues that his failure to respond is justified since the records are not documents within his "possession, custody or control" and, therefore, he is not required to produce them. *Rule 34(a), Federal Rules of Civil Procedure*, supra. He also contends that the records are privileged information and, as such, are not subject to discovery. *Rule 26(b)(1)* ("Parties may obtain discovery regarding any matter, *not privileged,* which is relevant to the subject matter involved in the pending action * * *." [emphasis supplied] ). Although there is authority which supports his position that the documents are not within his "care, custody or control," we do not rest our decision on that basis. See, *Neal v. Boulder,* 142 F.R.D. 325, 327 (D.Colo. 1992); *Greene v. Sears, Roebuck & Co.,* 40 F.R.D. 14 (N.D.Ohio 1966); see also, *Reeves v. Pennsylvania R. Co.,* 80 F.Supp. 107 (D.C.Del.1948). Rather, we find that, since LaPlant has not placed his medical or psychological condition in controversy, neither

---

**22.** The Plaintiff details a number of particulars that she regards as indicia of the City's discriminatory intent: The City refused to process the Union Representative's grievance which was filed on the Plaintiff's behalf; the Police Commission did not schedule a Hearing on the Plaintiff's dismissal; the City did not provide the Plaintiff with a reason for her termination; the Commission failed to consider a formal Motion in the minutes or to conduct a formal vote on her termination; and the Commission declined to fully and independently review the factual information that had been submitted by Fort. Although the Plaintiff's probationary status may have impacted upon each of these particulars, as a practical reality, however, the evidence proffered does not demonstrate, clearly and convincingly, that the City deliberately disregarded her rights, and discriminated against her because of her gender.

Rule 34 nor 35 [23] requires the production that the Plaintiff here seeks. *Schlagenhauf v. Holder,* 379 U.S. 104, 119, 85 S.Ct. 234, 243, 13 L.Ed.2d 152 (1964). While we recognize that the Plaintiff has not premised her discovery requests upon Rule 35 and, further, that the Rule expressly addresses the conduct of a medical examination, we are aware of no practical difference between the examination of medical records as distinct from the examination of the person to whom those records relate. More importantly, Rule 35 lends an instructive focus to our analysis.

Indisputably, LaPlant has an important privacy interest—near universally regarded as a privilege [24]—which counsels strongly against the discovery that the Plaintiff now seeks. If no more were needed to invade the privacy of one's medical or psychological records than the naming of that individual as a defendant in a legal proceeding, the physician-patient relationship would be unnecessarily impaired if not wholly contravened. We see no practical distinction between the request that the Plaintiff here makes and a request that LaPlant—and the other individual Defendants for that matter—undergo a battery of psychological evaluations and tests in order to assess their proclivity to discriminate on gender grounds. Accordingly, we deny the Plaintiff's Motion to Compel.

## IV. *Conclusion*

We are appreciative that, particularly in actions premised upon a violation of civil rights, the whole of a plaintiff's claim may be greater than the sum of its individual parts. Although we have taken pains to address the principal arguments that the parties have raised, we have also assessed the Record before us as an integrated whole so as not—proverbially—"to lose sight of the forest for the trees." We are satisfied, given that global view, that the Plaintiff's claim is not deserving of the extraordinary remedy of punitive relief.

NOW, THEREFORE, It is—

ORDERED:

1. That the Plaintiff's Amended Motion [Docket No. 17] for leave to amend her Complaint in order to allege a claim for punitive damages is DENIED.

2. That the Plaintiff's Amended Motion [Docket No. 17] for an Order compelling discovery against the Defendant Ralph La-Plant is DENIED.

23. Rule 35 reads, in part, as follows:

When the mental or physical condition * * * of a party, or of a person in custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner or to produce for examination the person in the party's custody * * *.

24. We are aware that the physician-patient privilege is not recognized by the Federal common law. *In re Doe,* 711 F.2d 1187, 1193 (2d Cir. 1983); *Filz v. Mayo Foundation,* 136 F.R.D. 165 (D.Minn.1991); *Oslund v. United States,* 128 F.R.D. 110 (D.Minn.1989). Nevertheless, State law is also implicated here and, even in the absence of binding State authority, we would recognize as a matter of comity and we would extend deference to those privileges established by State enactment when balancing the special Federal interests in securing the truth in a Federal Court proceeding. *Trammel v. United States,* 445 U.S. 40, 50, 100 S.Ct. 906, 912, 63 L.Ed.2d 186 (1980) (quoting *Elkins v. United States,* 364 U.S. 206, 234, 80 S.Ct. 1437, 1454, 4 L.Ed.2d 1669 (1960) (Frankfurter, J., dissenting); *Lora v. Board of Education of the City of New York,* 74 F.R.D. 565, 576 (E.D.N.Y.1977); *United States v. King,* 73 F.R.D. 103, 105 (E.D.N.Y.1976)). The State of Minnesota has extended to its citizens the expectation that the confidentiality of their medical records will not be unnecessarily breached, and we see no compelling basis to contravene that State policy here. See, *Minnesota Statutes Section 595.02, Subdivision 1(d); Minnesota Statutes Section 144.651, Subdivision 16.*